Let's call the first case for argument this morning is Tchinda v. Barr. If counsel on that case are ready to proceed, we'll hear first from counsel for petitioner. Good morning, and may it please the court. Peter Afrasiabi Pro Bono appointed counsel for petitioner Christophe Tchinda. Your Honor, there are two central errors in this appeal coming out of the Board of Immigration Appeals. The first is with respect to the nexus holding as adopted by the Board of Immigration Appeals, and the second is with respect to the legal conclusion made by the BIA regarding the Kat claim. Let me turn first to the nexus issue, which is the narrowest basis, I think, in this record to reverse the case. The BIA erred here because in sort of two respects with respect to nexus. It failed to apply the mixed motive standard from Parisimova in this court's case law, and it also adopted a narrative that what happened to Tchinda by the colonel was, quote-unquote, solely out of personal revenge, and the factual record here not only doesn't sustain it, but that solely conclusion really lacks any reasonable substantial probative evidence at all. When you look at the one central reason standard from Parisimova for asylum, or whether you look at the, quote, a reason, end quote, standard under Barajas-Romero for withholding, both were met here as a matter of law given the undisputed credible record testimony from Mr. Tchinda, given the documentary evidence in the country condition reports buttressed by the expert, and that record evidence shows really that the only basis for the persecution that was inflicted upon Mr. Tchinda was because of his imputed political opinion. But counsel, your client though never expressed any political opinion regarding anti-corruption. If I remember, his main reason for not wanting to inflate the invoices was that it, number one, conflicted with his religious views, and number two, he was afraid that he himself might get in trouble if he did that. Correct, your honor, and that is a political opinion. When he expressed his belief that, based on Christianity and his code of morality, that he was unwilling to engage in the corruption that is endemic and systemic to his nation, when he refused to participate in that default operating system that governs the country, because of morality, that is an expression of rejecting the default operating political standard. And so I think the fact that he said it was rooted in morality in his religion doesn't mean that it's therefore not political. The two are not mutually exclusive, in other words. Sorry to interrupt, but you said before the only conclusion that could be reached from this record is that he was expressing a political opinion. Isn't it fair to say that it's a possible conclusion that could be reached from this record? No, I think it's the only conclusion, because when he said, I'm not really... Well, respond to Judge Watford's point. It is possible to interpret what he said, and perhaps they applied the wrong standard where I think you're in a stronger position, but surely the record doesn't compel a conclusion that he was persecuted for his political opinion. Indeed, the IJ found him not credible. The BIA pretermitted that argument, and if you go back, they'll have to address it. But I'm a little bit bothered by your argument that we must be compelled to the conclusion, as opposed to the narrower argument I thought you were making, which is that the BIA applied the wrong standard. Correct, Your Honor, the BIA did apply the wrong standard by failing to address the mixed motive. But the reason I have argued that the only record evidence sustains his persecution on account of his expressed belief system, which was rejected by the Colonel, is because the BIA's conclusion that, well, this was a personal vendetta, that doesn't have any record evidence. All we know is that Mr. Chinda said, I'm not willing to engage in corruption. It's against my code of ethics. I'm not willing to participate in this political system. Because of my sincerely held Christian religious beliefs. And that's what triggered, then, the persecution. Excuse me, this is Judge Schroeder. Sorry to interrupt, but it was my understanding that the persecution didn't start until after he threatened to record him. Is that correct? Your Honor, yes, the persecution started after Chinda refused to provide the receipts to allow the Colonel to participate in the corruption within the system. And then, after the Colonel perceived and believed Chinda had engaged in whistleblowing or reporting. Now, the record shows Chinda didn't actually, in fact, report a whistleblow. But the Colonel believed he had whistleblown or reported this corruption. And that's what then led to Chinda being called into the office of the Colonel, the gun being brandished in Chinda's face, and Chinda's extreme fear and anguish, mental anguish, as a result of that. And then it culminated in... Well, isn't that evidence, isn't that substantial evidence that he was not going after him because of his political opinion, but because he was going to expose him? Well, Chinda's first expression of rejection to the Colonel was grounded in his belief that he's unwilling to engage in corruption. I understand that. But the question is, why did he persecute him? Was it on account of that belief or on account of his fear of being exposed? It was on account of Chinda's refusal to... Two reasons, on account of Chinda's refusal to participate in political corruption, but also on account of the perception that Chinda had whistleblown and reported corruption to the government, which is an imputed political opinion. And so that's what triggered, then, the cascading set of events that befell Mr. Chinda. And the Board of Immigration Appeals erred when it said, this is only a personal vendetta. It's got nothing to do with Chinda's expressed belief system. And I think that's where the BIA then erred, failing to apply a mixed motive standard and concluding that the record evidence could only show the opposite. I mean, the solely personal revenge motive is where the error lies. The second error here, though, is with respect to the Catt claim. And on the Catt claim, the BIA simply declared that as a matter of law, what befell Mr. Chinda wasn't torture. And I think that's where the BIA erred, and that's where this court should align itself with the Comillari case from the Seventh Circuit and the Habte-Michael case from the Eighth Circuit, which have expressly held that threats of death that cause severe mental anguish can constitute torture within the Convention Against Torture. Must they constitute torture? I'm sorry, I missed the question, Your Honor. Must they constitute torture? As I read the BIA's decision, it said, we don't find that the threats in this case arise to the level of torture. Are you telling us that threats must arise to the level of torture? No. I'm not saying that every time someone utters, you know, I will kill you, that therefore torture occurs as a matter of law. Not at all. What I'm saying is the torture here was in fact severe and caused severe mental anguish for Mr. Chinda. You see it, it's profound when you see it in the record where he's under such mental anguish and psychological strain from these threats and the gun being brandished in his face and the threats to his family that he even asks his tormentor, I don't know what to do, what should I do? And I think that's why when you then have the family house, you know, them entering the family house looking for him and the wife takes cover and then he flees to America. His credible testimony said, I am fearful of being murdered, of them carrying out the threat they've made. And so I think on this record, that is the type of severe mental anguish that does constitute torture as held in the sister circuit cases. And so on that basis. But my question is a little bit different. The BIA seems to have assumed that all happened and held as a matter of fact in this case that that didn't arise to the level of torture. Are you telling us that no reasonable fact finder could find differently? Yes, Your Honor, for this reason. What the BIA said is we don't think he was tortured because he didn't report it and nothing happened to the family when he left. And those aren't the poll stars by which we can judge whether or not torture has occurred. And so the central holding of the BIA was that he simply didn't experience torture because of those subsuming factors. But those subsuming factors aren't what drives the analysis. What drives the analysis is the threat of death that caused severe mental anguish, the expert that corroborated his claim, and the country condition reports, none of which were addressed within the Convention Against Torture analysis. And so it's on that basis that we contend the BIA erred as a matter of law on the Kat claim. I see I'm out of time, so I'd like to hold my last few seconds if I could for rebuttal, if the court would be so kind. Of course, we'll give you a couple of minutes for rebuttal. Let's hear from counsel for the government. Good morning, Your Honors. May it please the court, my name is Sharon Clay on behalf of the government. Petitioner's entire imputed political opinion claim rests on his refusal to create a false invoice and on his claim that the colonel believed that the petitioner planned to blow the whistle on his financial schemes. However, the evidence in this case does not provide any credible or direct circumstantial evidence of his particular nexus in his claim. Specifically, I'd like to point the court to the fact that the colonel, when the petitioner told the colonel that he was not going to do the invoice, the colonel's response was that he didn't care about the complaint. He said that the government was not going to do anything about it. So essentially, the colonel showed no concern about whether he held an opinion at all because he had no fear of retribution for engaging in the scheme in the first place. Second, the record also shows that when the petitioner was asked what he was going to put in his complaint, he testified specifically that he was going to ask for payment for the services rendered in the complaint, and that was it. There was no allegation that he wanted to actually expose any scheme. He just wanted to get his money back. He talked about the $6,000 he put up front to do the job initially, and he wanted to get his money back. No expression that he wanted to blow a whistle on a financial scheme. The next issue is when petitioner told the colonel he wasn't going to pay, he told the colonel he wasn't going to pay for personal reasons. His personal reasons were because of his religious faith. He was a Catholic, and he also said he was fearful of being arrested. At that time, he didn't say anything about the government, any scheme, about anybody else in the government that may have been part of this scheme that he was going after. Let me ask a question. The BIA assumes the credibility of Mr. Chinda, correct? Correct. Assuming the credibility, and therefore taking the facts that he alleges in the life's most favorable to him, why can't we read what occurred here as him acting on his anti-corruption beliefs? Because he also, oh, I'm sorry, go ahead. You suggest, and I don't think the BIA, that's my question is really, did the BIA find that he did not act on account of his anti-corruption beliefs, or that his actions were predominantly, the colonel's actions were predominantly for personal reasons? I think the board mostly landed on the case matter of NM, in which case the board in that decision decided that if a person had or expressed a desire to avoid exposure of a lucrative scheme but had no significant concern about the alien's political beliefs, that the petitioner cannot establish a nexus for the crime. Thank you, because that's the question I was asking. So why do we think that from this record, a reasonable fact finder couldn't find that the colonel had a mixed motive for his persecution? Because the petitioner told him what his motives were. The petitioner said, for religious reasons, my faith and my beliefs, and I fear going to jail. I don't want to be caught stealing. So he explains that that is his reason. He doesn't say, I think what you're doing is wrong. I think that the government is wrong for doing this. He doesn't express any kind of political opinions. He doesn't associate with people who have political opinions. And also in the record, if you look at his asylum application, he actually states that the colonel threatened him to make a profit. He didn't say anything about this grand scheme. I think that the scheme is sort of a characterization of what took place, but I don't think that that's how the petitioner perceived what had been happening at the time. I mean, his whole argument is that Cameroon is so corrupt that it's sort of like understood that there's bribery and there's extortion, and that's just how the Cameroonian government operates. And without any other evidence to show that he opposes that particular regime other than his religious reasons and fear of arrest, I don't think he made the leap to show that there was a nexus for the colonel. If he has religious reasons, then doesn't that show an opposition to that sort of regime? It does seem to me that there's direct evidence, but there's direct evidence from the colonel himself saying he doesn't care about the reasons. He just simply said the government is on my side. I get to do what I want to do. I don't have to be concerned about how you feel about what I'm doing, because I can do this with impunity. And then when Chinda threatens to make a report, the colonel, whose testimony we don't have, obviously, the colonel retaliates. So I'm having difficulty figuring out why we should believe he wasn't concerned. Well, I want to go back to that particular question that you're asking. The colonel's belief that the petitioner planned to file a complaint is actually called into question on this particular record. The reason why I say that is because the petitioner gave inconsistent statements regarding how and when the colonel learned of the complaint. I had found the petitioner credible. The BIA found the petitioner credible. He found him credible, but in his federal fear interview, he said that in his declaration, he stated that he told the colonel that he was going to file a complaint. The colonel didn't find out later. During his testimony, he says that the colonel found out later, but he wasn't sure how he found out. The fact that he has these two alternative theories for how the colonel actually found out about his alleged complaint calls into question the fact that was there actually a complaint at all? And if you look at the declaration, also contrary to what's argued in opposing counsel's brief, actually says that the declaration says his friends advised him against filing a complaint. So either you believe his CFI, his federal fear. Excuse me? We were reviewing the BIA decision, so we can't make credibility determinations because the BIA assumed he was credible. Well, I'm not asking you to make a credibility determination. What I'm saying is that we don't know when or the timeline for when the colonel found out about the proposed complaint because he's given two theories as to when he found out. But don't we have to accept the theory most favorable to Chenda since the BIA assumed him to be credible? Well, yes. I mean, he did assume him to be credible, but there's also credible evidence from Chenda in the record that says that the And if he's supposed to make out a case for asylum or withholding or removal, he's got to establish the nexus, not just simply that he had a political opinion. He's got to also demonstrate that the colonel threatened him on that opinion. And because we don't know when, we can't truly establish a timeline as to when the colonel found out because it's either when he said he found out from others or based on a declaration when he said he told him initially when he found out. The day that he refused to do it is the same time that he actually told the colonel that if he didn't pay him, that he was going to file a complaint with the minister of defense. So he's credible, but which story do you believe? Did he tell him when he initially refused to do the invoice, or did he tell him when, or did he find out later from other people? And because he has claimed both, we don't know which one of those circumstances is true. They can't both be true, even though he's credible. And that's the reason why I would argue that he has not met his burden of proof for establishing nexus in this particular case. The timing has been questioned by his own testimony. He's given two different contradictory pieces of evidence or testimony to explain when the colonel found out about it. So we can't say that the threats increased after the fact or before the fact because we don't know which truth is true or which is the case. And turning to the petitioner, the cat claim, the board presumed that the petitioner had not been tortured because the petitioner actually conceded as much in his brief before the board. And the crux of his argument before the board was that he didn't have to establish torture per se, just the fact that he might be killed on the way back was sufficient enough. But feeding torture, you can't fault the board for saying there's no torture here because he essentially didn't argue that he was tortured before the board. And the board didn't have to address whether or not the acts that occurred rose to the level of torture because it was conceded in advance. The likelihood of future torture is established by the relevant facts in the case. When you decide on torture, it's not just past torture, but you also consider the ability to relocate. You consider the gross flagrant abuses in the country and all relevant evidence. In this particular case, the agency concluded that the fact that his family members remained in Cameroon unharmed even though they had been threatened as well, they found that relevant to his likelihood of future harm. The fact that there's no evidence in the record to show that the colonel has a continued interest in him, they found that relevant to the fact that he may not be tortured in the future. The fact that he never actually filed a complaint means that there's no whistleblower and there's no ultimate threat or death for any particular reason. And then there's three years that's been passed. The agency also took a look at the record evidence and concluded that there was no particularized threat of torture looking at the country conditions in the case. Essentially what the board found was that the human rights abuses that were related in the case were incidences involving Boko Haram in the northern region and usually people who were subjected to torture were criminal suspects or those who were linked or suspected to be a part of Boko Haram. And I know opposing counsel didn't bring up the expert testimony, but I would just like to state that the immigration judge did not err in weighing against limiting the weight of the evidence in this particular case. I didn't think that we didn't – we're arguing that it's not arbitrary, capricious or contrary to law. There was no abuse of discretion. The IJ gave specific reasons for why they limited the weight and there's record evidence demonstrating why the evidence should have been limited, namely that the expert admitted to having limited familiarity with the specific facts in the case. If you look at the record, the record also shows that the petitioner did not even speak to the expert about his particular case. The attorney spoke to the expert about the case. And also in the record it shows that the expert incorrectly stated that petitioner was being persecuted by military officers who wanted to take over his business. The fact that the expert believes that his claim is based on some military personnel who were trying to take over his business already places in doubt why he surmises that there's a likelihood of him being tortured. That wasn't the circumstances of his particular case. He refused to do a falsification of an invoice. There was no attempt to take over his business. And so you have to question how relevant or how probative is the evidence to expert testimony in this particular case, given that the basis for his testimony is inaccurate. In addition to that, the IJ – Thank you, counsel. Counsel, you've gone well over your time. Oh, I'm sorry. I wasn't looking. No, that's fine. It's my job to stay on track. I'm sorry, but thank you very much. Yes, thank you for being willing to go forward with the argument today. We appreciate it. Okay, let's put two minutes on the clock for counsel for petitioner. Thank you, your honors. Two narrow points. The first is that sincerely held Catholic beliefs can be political, and I don't think the court can say that they are, as a matter of law, not capable of being seen as political beliefs, especially when they are occurring within a country that's undisputed as one of the most corrupt countries on the planet. And that's from the country condition reports, and it's also from the expert. And I'll get to the expert. The second issue that's critical here is that the withholding standard is a lower standard than the asylum standard with respect to nexus. And that's this court's case law, Barajas-Romero, which expressly says that the yardstick is a lower substantive benchmark than the one central reason standard. And so I think within withholding, certainly a reason was his expressed belief system that was perceived and imputed as being an anti-government belief system. Finally, your honors, with respect to the expert, the expert did what experts do all the time. Of course, the expert spoke to counsel. The expert gathered up information, and the factual record, as the expert testified, was undisputed that he had personal knowledge about the facts as he had learned the facts of the case. And that wasn't disputed on cross-examination even. If you look at the record at 279 to 290, he was simply asked, are you familiar with the facts of the case? And he said yes. And so what he said then was that he, as an expert, confirmed that Chinda does face a risk of torture if returned, and that the torture that occurs in that system is not simply just for bona fide criminals and other people like that. It's widespread. And Chinda himself, whose credible testimony was that he feared being tortured if he was returned, the expert confirmed that in his expert opinion, that was likely. And so when the lower court simply said, we're giving it limited weight, whatever exactly that means, really when you read the opinion what happened is the lower court just gave it no weight because it doesn't factor in anywhere when it's highly corroborative and probative of his convention against torture claim. And so on that basis, we would submit, Your Honors, that this court should reverse. Okay. Thank you, counsel. And counsel, thank you very much for being willing to accept this case as part of our pro bono program. Your client was very lucky to have you appointed as his counsel, and the court is very appreciative of your efforts in this case. So thank you. Agreed. Okay. The case just argued is submitted, and we'll take a break until counsel for the second case are ready to go.
judges: Schroeder, Watford, Hurwitz